297 So.2d 122 (1974)
C.A. FIELLAND, INC., a Florida Corporation, Appellant,
v.
FIDELITY AND CASUALTY COMPANY OF NEW YORK, a New York Corporation, Appellee.
No. 72-806.
District Court of Appeal of Florida, Second District.
May 8, 1974.
Rehearings Denied June 17, 1974.
*124 John R. Bush of Macfarlane, Ferguson, Allison & Kelly, Tampa, for appellant.
W. Donald Cox of Fowler, White, Gillen, Humkey, Kinney & Boggs, Tampa, for appellee.
GRIMES, Judge.
C.A. Fielland, Inc. (Fielland) and Paul Smith Construction Company (Smith) constructed a ten-story office building in the City of Tampa known as the Marine Bank Building for its owner, 315 Madison Corp. (315 Madison). Several years after construction, the brick veneer wall of the building began to fall and collapse. As a result 315 Madison was paid $171,000 by its insurer, the Continental Insurance Company (Continental), under a Special Multi-peril policy providing property and liability coverage. Thereafter, Continental sued Fielland and Smith and three architects in a subrogation action for the amount which Continental had paid 315 Madison. Fielland called on its insurer, Fidelity and Casualty Company of New York (F & C) to defend under a Comprehensive-General Automobile Liability policy, which included completed operations coverage, and to pay all damages awarded against Fielland. Following its denial of coverage and refusal to defend, F & C was sued by Fielland in a third-party action.
Continental's suit against Fielland, Smith and the three architects resulted in a jury verdict of $125,000 in favor of Continental against Fielland and Smith. Of this verdict Fielland and Smith each paid $57,500. The balance was paid by the architects despite their exoneration.
The claim of Fielland against F & C was heard by the trial court without a jury upon stipulation of the parties. After the taking of testimony, the trial judge entered final judgment for Fielland against F & C in the sum of $15,750. The award included $20,250, less $10,000 deductible, plus $5,500 for attorneys' fees incurred in the third-party action. Attorneys' fees for the defense of the main action were denied to Fielland. Both Fielland and F & C filed timely appeals from this judgment.
The F & C policy contained the following provisions material here:
INSURING AGREEMENTS
* * * * * *
Coverage C  Property Damage Liability  Except Automobile
To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident.
* * * * * *
EXCLUSIONS
This policy does not apply:
* * * * * *
(j) under coverage C, to injury to or destruction of ... (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises;

(emphasis supplied)
There were essentially five elements of damage included within the $171,000 subrogation claim. These were:
(1) the cost of demolition of the damaged wall;
(2) the rentals paid to an adjacent parking lot owner during demolition so as to pre-empt his parking lot and avoid the danger of falling debris;

*125 (3) the cost of reconstructing the wall;
(4) the rental of the parking lot during reconstruction; and
(5) the cost of waterproofing the building.
F & C contended that these damages were excluded from the policy under exclusion (j) because they were the result of injury or destruction to work completed by Fielland, the named insured. The trial judge accepted the theory of F & C's argument in that he held that there was no coverage under the policy for damage to the building itself. However, he said that Fielland would be protected under the policy to the extent that the defect in the wall resulted in damage to the person or property of others. He concluded that under the facts of the case, Fielland was entitled to recover any damages it sustained from the wall having fallen or threatening to fall on the parking lot and ruled that the measure of such damages was the cost of demolishing the wall and the rental of the parking lot during demolition.
The judge correctly held that coverage under the F & C policy did not include damage to the building itself because Fielland built the building. Other courts have construed language similar to that of exclusion (j) in the same manner. Vobill Homes, Inc. v. Hartford Accident and Indem. Co., La. App. 1965, 179 So.2d 496; Liberty Building Company v. Royal Indem. Company, 1960, 177 Cal. App.2d 583, 2 Cal. Rptr. 329. A contrary holding would have the effect of converting the policy into a performance bond rather than liability insurance. The cases cited by Fielland in support of coverage are distinguishable.[1]
Fielland asserts that even if the judge were correct in limiting its recovery to the cost of demolishing the wall and the parking lot rental during demolition, the judge erred in limiting the amount of the recovery to the gross sum of $20,250.
In the primary action Continental introduced evidence that the cost of demolition was $21,060 and the fees paid for the rental of the adjacent parking lot during demolition totalled $23,024. Thus, Fielland contends that even under the judge's theory of the case, it should have been entitled to a recovery of the entire $44,084.40 from F & C since this sum was not in excess of the $57,500 paid by Fielland on the judgment. On the other hand, F & C points out that while the total amount of the subrogation claim was $171,000, the jury awarded only $125,000. Therefore, it cannot be determined with certainty that any part of the claims for the cost of demolition or the parking lot rental during demolition were within the $125,000 judgment entered against Fielland. The parties stipulated that in ruling on the cross-claim, the judge could consider not only the testimony presented at the hearing on the cross-claim but also the evidence presented during the trial of the primary claim. Under the circumstances, there is no way to tell how the gross amount of the third-party judgment came to be set at $20,750.[2] In his capacity as the trier of facts, the judge performed the same function as the jury. *126 Since that sum was within the legal boundaries prescribed by the evidence before him, we cannot say that he erred.
In its cross-appeal, F & C first contends that there was no coverage whatsoever because the building was built by a joint venture and the policy was issued only to C.A. Fielland. Yet, the policy reflects that it was issued to Fielland as a contractor and the liability imposed upon Fielland was because of work done in that capacity. Perhaps the best answer to this contention is that a joint venture is not a separate legal entity. Therefore, absent specific language in the policy to the contrary, Fielland was covered in connection with the construction of the building even though he happened to become involved in this particular construction as a joint venturer along with another party. See W.B. Johnston Grain Company v. Self (Okl. 1959), 344 P.2d 653; Insurance Company of North America v. Department of Industry, Labor and Human Relations (1970), 45 Wis.2d 361, 173 N.W.2d 192; cf. Cochrane v. American Surety Company of New York, Fla.App.2d, 1959, 108 So.2d 315.
F & C also contends that even if its policy covered Fielland for the construction of the building, the court erred in permitting Fielland to recover the cost of demolition and the rental of the parking lot during demolition. F & C points out that the basis upon which the court permitted the recovery for these elements in the face of exclusion (j) was that they constituted damage to the property of someone other than 315 Madison. Yet, the primary claim for which Fielland sought to be indemnified was asserted by Continental solely as subrogee of 315 Madison.
From a conceptual standpoint, there is merit in this contention. Yet, F & C would have to concede that if the parking lot owner who was deprived of the use of his property during demolition or a pedestrian who happened to get hit by a falling brick before the rest of the wall was taken down brought suit against Fielland as a consequence, its policy would cover. The action of 315 Madison in paying for the loss of use of the parking lot and in paying for the demolition had the practical effect of precluding potential claims which could have been made and which would have been within the coverage of the F & C policy. Admittedly, the receipt of the payments by the parking lot owner or the injured pedestrian would not have prevented either of them from suing Fielland, but Fielland (and hence F & C) would have been entitled to an offset by the amount of these payments under F.S. § 768.041, F.S.A. See Hertz Corporation v. Hellens, Fla.App.2d, 1962, 140 So.2d 73. Under the circumstances, F & C is in no position to complain, particularly since it chose not to defend Fielland and, therefore, gave up the opportunity of attempting to prevent such "improper" elements of damage from being included in the subrogation claim. We think the result reached was fair, and we decline to disturb it.
There is one final point which must be considered. The judge awarded Fielland attorneys' fees incurred in connection with its cross-claim against F & C but denied Fielland its claim for attorneys' fees incurred in the defense of the primary action. Yet, there could have been no recovery by Fielland against F & C in the third-party action unless those elements of damage for which recovery was allowed were held to be within the coverage afforded to Fielland with respect to the defense of the original action. Hence, it appears that a portion of Continental's claim in the primary action was within the coverage afforded Fielland by the F & C policy.
Perhaps the reason the court declined to award Fielland any portion of the attorneys' fees for the defense of the original claim was because there was no determination that these particular elements of damage were within the coverage until after the trial of the original claim. Certainly, one could not perceive from the face of the complaint that damages such as those *127 in question were being asserted by Continental.
Even though only a portion of a claim made against an insured is within the liability coverage, the insurance carrier has the duty to defend the entire action, at least until such time as the covered portions of the claim have been eliminated from the suit. The Garden Sanctuary, Inc. v. Insurance Company of North America, Fla.App.2d, 1974, 292 So.2d 75, filed March 27, 1974. The duty to defend, in the first instance, is determined from the allegations of the complaint. Bennett v. Fidelity and Casualty Company of New York, Fla.App. 1st, 1961, 132 So.2d 788. Yet, if it later becomes apparent that claims not originally within the scope of the pleadings are being made which are within the insurance coverage, the insurance carrier upon notification would then become obligated to defend. St. Paul Fire & Marine Insurance Co. v. Hodor, Fla.App.3rd, 1967, 200 So.2d 205; cf. Sussman v. American Surety Company of New York (CA 5, 1965), 345 F.2d 679. Since the theory of pleading in state courts of Florida is now much like that of the Federal courts, the following comment in Milliken v. Fidelity and Casualty Company of New York (CA 10, 1964), 338 F.2d 35, is pertinent:
"This court has consistently held that as a general rule the duty of an insurer to defend its insured in federal court litigation is determined in the beginning of the litigation by the coverage afforded by the policy, as compared with the allegations of the complaint filed in the action. But, the allegations of the complaint are not conclusive on the issue. The duty to defend may attach at some later stage of the litigation if the issues of the case are so changed or enlarged as to come within the policy coverage. The reason for this rule is that `* * * [u]nder the Federal Rules of Civil Procedure the dimensions of a lawsuit are not determined by the pleadings because the pleadings are not a rigid and unchangeable blueprint of the rights of the parties. * * *' Thus, the insurer's duty to defend an action brought in federal court against its insured may arise or attach at any stage in the litigation...."
In this case, the claims relating to the cost of demolition and the parking rental fees during demolition were originally made by Continental Insurance Company. The record reflects that F & C which is a member company of the Continental Insurance Group, was represented by the same attorneys who represented Continental. Therefore, F & C must be deemed to have known at an early stage of the litigation of the existence of these claims, even though the legal determination that such claims were covered under the F & C policy was not made until after the primary suit was concluded. As a consequence, we are compelled to reverse that portion of the judgment which denies Fielland its claim for attorneys' fees expended in connection with the defense of the primary action. The amount which Fielland actually paid its private attorneys to defend this action was $10,000. No one has disputed the reasonableness of these fees, and upon this record we see no basis for anything other than requiring the total amount of these fees to be paid by F & C.
We therefore direct the lower court to enter a final judgment in favor of the appellant in the total sum of $25,750. Except as set forth above, the judgment is affirmed. The trial judge should be commended for his judicious handling of a very complicated case.
McNULTY, A.C.J., and BOARDMAN, J., concur.
NOTES
[1] In Shelby Mutual Insurance Company v. Ferber Sheet Metal Works, Inc., Fla.App.1st, 1963, 156 So.2d 748, even though the damaged property was owned by the party on whose building the insured was working, such property was not part of the work which had been completed by the insured. Bundy Tubing Company v. Royal Indemnity Company (CA 6th), 298 F.2d 151, involved the furnishing of a product rather than the completion of work by the insured, but even there the court was careful to exclude the cost of the defective product from the coverage.
[2] Fielland offers the conjecture that the court probably prorated the $44,084.40 by the percentage of the judgment paid by Fielland (46%). However, even if we held that it would be error to reduce the award because part of the judgment was paid by other parties, we cannot say that the award was determined in this manner because the figures do not come out with mathematical exactitude.